## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOSEPH B. MORSE,
     4815 Rutan Place SW
     Seattle, WA 98116,

          *Plaintiff*,

   v.

RYAN D. MCCARTHY, *in his official capacity as Secretary of the Army*,
     101 Army, Pentagon
     Washington, DC 20310,

   and

ARMY BOARD FOR CORRECTION OF MILITARY RECORDS,
     251 18th Street South, Suite 385
     Arlington, VA 22202

         *Defendants*.

Case No. _____

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.     This case concerns the failure of the Army Board for Correction of Military Records to faithfully carry out the task assigned to it by law. The Board bears the duty to "correct any military record" of an individual soldier or officer when doing so is "necessary to correct an error or remove an injustice." 10 U.S.C. § 1552(a)(1). In carrying out that critical mandate, the Board must apply controlling Army regulations governing the preparation and correction of military records. And, critically, the Board must apply its own independent judgment to each case; it may not abdicate its responsibility by simply deferring to the prior judgment of those Army officials whose errors the Board has been asked to correct. Unthinking deference would essentially nullify the entire record-corrections process, contrary to the clear

and express intent of Congress. Yet in this case, the Board did exactly that. Rather than correct the errors presented to it, the Board deferred to the very Army officials who had bowed to political pressures and destroyed the career of a decorated officer, and in the process ignored patent errors of fact and law. Under the Administrative Procedure Act, this Court should vacate the Board's decision and remand to the Board with instructions to carry out its review in a manner consistent with its duties under law.

2.      Plaintiff Joseph B. ("Jay") Morse is a retired Lieutenant Colonel ("LTC") of the United States Army who dedicated his career to the Uniform Code of Military Justice.  At various times, he both prosecuted and defended accused criminal offenders within the Army's ranks to protect the rule of law and each soldier's due process rights. In particular, as Chief of the Army's Trial Counsel Assistance Program ("TCAP"), he "[p]rovide[d] advice, assistance, and training to prosecutors worldwide"; "provide[d] direct, on-site assistance in unique, complex, or high-profile cases"; "[a]ct[ed] as liaison between prosecutors in the field and the Government Appellate Division (GAD) on all extraordinary writs and government appeals"; and "[d]evelop[ed] training material and conduct[ed] worldwide advocacy and military justice training." Ex. A (2014 Officer Evaluation Report ("OER")), at 1. In short, he was the U.S. Army's top prosecutor. His commander lauded "[h]is superb critical thinking, exceptional interpersonal skills and visionary leadership," noting that "TCAP thrived under the incredibly positive work atmosphere that LTC Morse created." Ex. A, at 2. "His outstanding leadership," said his commander, "directly resulted in TCAP becoming a force multiplier for the prosecution of high profile courts-martial and superior criminal law training through the Army." Ex A., at 2. These observations were consistent with commendations that LTC Morse received throughout his military career.

2

3.      In early 2014, while members of Congress and civilian Defense Department officials exerted intense pressure on top military brass to eliminate sex crimes by service members, LTC Morse was accused by a fellow officer of having committed a sexual assault years before. Because of his position as the top prosecutor in the Army, the allegations received extraordinary public and media attention. LTC Morse admitted that he had exercised poor judgment by kissing a colleague late at night, after several rounds of drinks, at a professional conference, but he categorically denied the allegations of sexual assault.

4.      There was significant evidence from the beginning that the accuser's version of events lacked credibility. But in light of political pressure and the highly publicized nature of the allegations, the Army officials who investigated LTC Morse determined there was probable cause to believe he had committed sexual assault. They reached that conclusion after a fundamentally unfair investigation exemplified by an extraordinary—and lawless—directive to LTC Morse by a commanding officer. Under threat of punishment under the Uniform Code of Military Justice, that directive commanded LTC Morse *and his defense counsel* to halt counsel's efforts to communicate with potential witnesses, investigate the allegations, and otherwise prepare a defense. After LTC Morse filed a writ petition with the Army Court for Criminal Appeals, the official who issued the order withdrew it. Eventually, LTC Morse's commander correctly perceived the baselessness of the charges and issued LTC Morse a "locally-filed" letter of reprimand for poor judgment—in effect, a counseling statement which is not a part of his permanent personnel file. LTC Morse agrees with his commander's determination that he exercised poor judgment. He also agrees with, and appreciates, his commanding officer's judgment that he was guilty of nothing more.

5.      By the time of LTC Morse's next OER in September 2014, however, then-Army Secretary John McHugh had personally intervened, for political reasons, to direct that LTC Morse be removed from his position as TCAP Chief. Yielding to pressure from Secretary McHugh, the brigadier general who prepared the OER gave LTC Morse a poor overall score—despite lauding his performance on the job—and relieved him as TCAP Chief. The sole stated basis for that decision was the fact that LTC Morse had been "titled" for the alleged sexual assault—meaning simply, in military jargon, that military prosecutors determined that his accuser's allegation merited initial investigation.[1] In an effort to clear his name, LTC Morse requested a supplementary review of the OER. But the reviewing officer declined to grant any relief to LTC Morse, in the process mischaracterizing the evidence before him and ignoring governing legal standards.

6.      LTC Morse retired honorably in September 2015. Since retiring, he has worked as a consultant and is currently an MBA student in Seattle. His life, however, has never been the same. Despite his distinguished service, LTC Morse has experienced significant difficulties finding post-military employment, applying for graduate programs, and even going through security at airports. Anyone who Googles his name inevitably comes across the highly publicized accusations against him.

7.      LTC Morse has pursued all available administrative remedies to clear the Army's records of the charges against him. He submitted an administrative request for the Army's Criminal Investigation Command ("CIDC") to amend its Report of Investigation to indicate there

---

[1] "Titling" is "[p]lacing the name and identifying information of a person, corporation, other legal entity, or activity in the title block of a criminal investigative report." Department of Defense Instruction ("DoDI") 5505.07, at G.2 (Feb. 28, 2018). The titling decision is an "administrative procedure[]" and does "not imply any degree of guilt or innocence." *Id.*, at ¶ 1.2(b).

was insufficient evidence to "title" him or to refer the charges to his commander. He also submitted additional evidence that further called his accuser's allegations and credibility into question. CIDC denied LTC Morse's request, however, mischaracterizing the evidence before it and ignoring governing law in the process.

8.      LTC Morse then asked the Army Board for Correction of Military Records to (1) vacate the titling and probable cause decisions, (2) remove his name from the Report of Investigation, and (3) overturn the improper OER. The Board is "the highest level of administrative review within the Department of the Army," charged with the responsibility "to correct errors in or remove injustices from Army military records."[2] Here, however, the Board failed in its duty. Like the reviewers that preceded it, the Board mischaracterized the record, ignored relevant legal standards, failed to adequately address all of the arguments presented, and denied LTC Morse the relief to which he was entitled under law. *See* Ex. B (Denial Order).

9.      LTC Morse now asks this Court to vacate the Board's Denial Order because it was arbitrary and capricious, and contrary to law; and to remand to the Board for redetermination under the correct legal standards. In the alternative, if the Court determines that the Board failed to offer sufficient explanation for its Denial Order, LTC Morse asks that this Court remand for the Board to offer an adequate explanation for its action. To be clear, LTC Morse does not ask the Court to address the truth or falsity of the accusation made against him, or whether the original investigating officials had reason to think so. The issue here is simply whether the Board followed proper procedure and applied the correct standards in addressing LTC Morse's request

---

[2] U.S. Army, *The Army Board for Correction of Military Records*, http://bit.ly/2RpY9ae (last visited Nov. 26, 2019); *see* 10 U.S.C. § 1552(a)(1).

for administrative relief, in the form of correcting his record of military service. Because the answer to that narrow question is no, the Board's decision must be set aside.

## PARTIES

10.     Plaintiff Joseph B. Morse is a U.S. Army veteran. He retired honorably with twenty-two years of active-duty service, at the rank of Lieutenant Colonel.

11.     Defendant Ryan D. McCarthy is sued in his official capacity as Secretary of the United States Army. Secretary McCarthy's principal place of business is 101 Army Pentagon, Washington, D.C. 20310. Because he is the officer with final authority for records correction within the Department of the Army, *see* 10 U.S.C. § 1552(a)(1) & (a)(3)(A), Secretary McCarthy is the proper defendant for these APA causes of action.

12.     Defendant Army Board for Correction of Military Records is a board of the Department of the Army. *See* 32 C.F.R. § 581.3. Under 10 U.S.C. § 1552, Secretary McCarthy has delegated his record-correction authority to the Board. The Board's principal place of business is 251 18th Street South, Suite 385, Arlington, VA 22202.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

14.     LTC Morse has standing to seek review of the Board's order denying his request for amendments to his military records.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e).

16.     The Board's Denial Order is a final agency action under 5 U.S.C. § 704.

## BACKGROUND

I.   **FACTUAL BACKGROUND**

A.   **LTC Morse's Dedicated Service**

17.   Jay Morse was commissioned as a Second Lieutenant in the U.S. Army Reserve on May 24, 1993 and entered active duty six days later. An outstanding soldier and leader, he graduated from the Army's Air Assault, Airborne, and Ranger Schools. He attended law school after being selected for the prestigious Funded Legal Education Program in 1998. After law school, he joined the Army's Judge Advocate General Corps in 2001 and was promoted to Major in 2004. He served honorably in Iraq from January 2005 to May 2006 and was promoted to Lieutenant Colonel in 2009.

18.   LTC Morse's performance was consistently outstanding. In a 2004 OER, LTC Ida F. Agamy wrote that Morse (then a Major) had "[a]bsolute[ly] unlimited potential" and was "the epitome of the Soldier/lawyer ethos." Major General ("MG") John F. Campbell wrote in a 2011 OER that LTC Morse's work had been a "[b]rilliant performance by a top 1% officer," and recommended that LTC Morse be "[s]elect[ed] early for the War College, promote[d] below-the-zone to Colonel, and groom[ed] . . . to be a General Officer." Similarly, in a 2013 OER, Colonel ("COL") Michael Mulligan wrote that LTC Morse was "[u]nquestionably the best Lieutenant Colonel in the JAG Corps," and recommended that he be "[p]romote[d] NOW to Colonel," because "LTC Jay Morse is a Colonel in every sense except pay."

19.   Because of his dedication, performance, and leadership abilities, LTC Morse was appointed Chief of the Trial Counsel Assistance Program in 2011. As the U.S. Army's top prosecutor, LTC Morse "[led] the [TCAP], a strategic asset for the Army's prosecutorial function," and "[s]upervise[d] and mentor[ed]" a staff of 33. Ex. A, at 1. His commander noted that he "was the epitome of professionalism . . . and displayed the highest character." Ex. A, at 1.

"His superb critical thinking, exceptional interpersonal skills and visionary leadership resulted in the creation and implementation of 23 Special Victim NCO Paralegal positions." Ex. A, at 2. Not only was he a model soldier himself, but he also built up those around him: "TCAP thrived under the incredibly positive work atmosphere that LTC Morse created." Ex. A, at 2. In fact, "[h]is outstanding leadership directly resulted in TCAP becoming a force multiplier for the prosecution of high profile courts-martial and superior criminal law training through the Army." Ex. A, at 2.

20.     LTC Morse was perhaps best known for his work prosecuting Robert Bales, "[a] decorated American soldier" who "kill[ed] 16 unarmed Afghan civilians, mostly women and children." Eric M. Johnson, *U.S. soldier who killed Afghan villagers gets life without parole*, Reuters (Aug. 22, 2013), https://reut.rs/2OJIG30. The Army's Judge Advocate General handpicked LTC Morse to lead this prosecution. LTC Morse and his team secured a life sentence without parole for Bales in what was called "the worst war-crimes case to arise from the war in Afghanistan." Craig Whitlock, *Former Army sex-crimes prosecutor reprimanded, plans to retire*, Wash. Post (July 17, 2014), https://wapo.st/2LfV3BC; *see also* Ex. A, at 2 ("He assembled and led a trial team to a successful court-martial prosecution of [a soldier] convicted of the worst murders and atrocities committed by a Soldier in recent history."). The Judge Advocate General also selected LTC Morse to brief key members of Congress and their staffs regarding proposals for dealing with service member sexual assault.

21.     In sum, LTC Morse's professional record and reputation were nothing less than "stellar." *See* Whitlock, *supra*. By early 2014, he had been chosen to attend the Army's Senior Service College, a select opportunity for officers identified as future general officers, and he expected to be promoted to Colonel in the near future—a promotion his commanders had been recommending for years.

**B.     Significant Pressure Exerted Against Military Brass to Aggressively Investigate and Prosecute Sex Assault**

22.     In 2013, a series of sexual assaults committed by members of the armed forces attracted significant public attention. "With angry lawmakers in Congress demanding a crackdown, then-Defense Secretary Chuck Hagel ordered the armed forces in May 2013 to retrain and rescreen tens of thousands of military recruiters and sexual assault prevention officers." Craig Whitlock, *In the military, trusted officers have become alleged assailants in sex crimes*, Wash. Post (Oct. 19, 2017), https://wapo.st/2sInull. "Since then, the military has invested millions of additional dollars in sexual assault awareness programs," and "[t]op brass have promised to redouble their efforts to punish offenders and protect victims." *Id.*

23.     In September 2013, Army Secretary John McHugh circulated a memorandum emphasizing that

> [b]oth officers and noncommissioned officers . . . must commit themselves to eliminating sexual harassment and assault and to fostering climates of dignity and respect in their units. The Army is taking important steps to provide new training for our leaders, strengthen our training enterprise for all Soldiers, improve our investigative and military justice capabilities and further professionalize our first responders. Even with strong leader emphasis and innovative new programs, we continue to strive for greater progress in preventing sexual assault in our ranks.

Army Directive 2013-20, ¶ 2 (Sept. 27, 2013). Accordingly, Directive 2013-20 mandated that superior officers who "failed to report a sexual harassment or assault" or "failed to respond to a complaint or report of sexual harassment or sexual assault" would face administrative action. *Id.* ¶ 4.

24.     The military's efforts, however, left Congress and the White House unsatisfied. In December 2013, President Barack Obama signed "a sweeping defense policy law . . . that crack[ed] down on sexual assault in the military." Philip Rucker, *Obama signs defense law, calls*

*it a 'welcome step' toward closing Guantanamo Bay prison*, Wash. Post (Dec. 26, 2013),
https://wapo.st/2re3xCm. But the law "stop[ped] short of the broad reforms that Sen. Kirsten
Gillibrand . . . and other advocates ha[d] been calling for," *id.*, and President Obama "delivered
an ultimatum to military leaders to deliver results within a year or face even more change,"
Editorial Board, *New sexual assault policies for the military may not go far enough*, Wash. Post
(Dec. 28, 2013), https://wapo.st/34LUAyF. "'If I do not see the kind of progress I expect, then
we will consider additional reforms,' Mr. Obama said," and he set December 1, 2014 "as the
deadline for the Pentagon to show 'substantial improvements' in sexual assault prevention and
response, including military justice." *Id.*

25.     Lawmakers, in particular Senator Gillibrand, continued fighting for more
sweeping change—including "tak[ing] major crimes like sexual assault outside the military chain
of command." Allie Jones, *Sen. Gillibrand's Military Sexual Assault Reform Bill Blocked*, The
Atlantic (Mar. 6, 2014), http://bit.ly/2Yayeog. These efforts came to a crescendo in early 2014,
when, "[a]fter heated debate on the floor," *id.*, Senator Gillibrand's bill died in March 2014.

### C.     LTC Morse Accused and Investigated

26.     In February 2014, during President Obama's one-year probationary period for the
military—and just before a highly publicized vote on Senator Gillibrand's bill—an Army lawyer
reported to Army investigators that LTC Morse had sexually assaulted her in March 2011, while
she and LTC Morse were attending a sexual-assault-prevention conference for Army lawyers.
According to her, she went out to dinner and drinks with a group of officers (LTC Morse among
them), and then returned to her hotel room. She stated that she then received a call from LTC
Morse inviting her to his room. She claimed that she entered his room, sat on his bed, and that, at
some point, she decided to leave the room. She claimed that LTC Morse then kissed and groped
her against her will. She stated that she left the room as soon as she could and threw up in the

hotel's stairwell. She further alleged that the next morning, instead of participating in the conference sessions as usual, she sat in the back of the room without speaking to anyone.

27.     During the ensuing investigation, LTC Morse admitted that he had exercised poor judgment by consensually kissing a colleague after they had both been drinking. But at all times he denied ever groping or fondling his accuser, or kissing her without her consent.

28.     Arriving in the middle of a national push to eliminate sex crimes among service members, the allegations against LTC Morse drew significant media attention. The accusation's basic narrative alone guaranteed it would make headlines: "The Army's Top Sexual Assault Lawyer Accused of Sexual Assault—at a Sexual Assault Legal Conference." Josh Voorhees, Slate (Mar. 6, 2014), http://bit.ly/2qdwjma. In no time at all, the story was everywhere.[3]

29.     Army investigators collected significant amounts of evidence throughout February and March 2014 from interviews with other lawyers who had been at the conference, and LTC Morse began to work with his counsel to prepare a defense. However, it quickly became apparent that the investigation was hurtling toward a preordained outcome. The

---

[3] *See, e.g.*, Alexandra Sifferlin, *Army Reportedly Suspends Sexual Assault Investigator*, Time (Mar. 6, 2014), http://ti.me/NZIb1W ("The Army has suspended its top investigator for sexual assault cases while it looks into allegations that he sexually assaulted a lawyer at a conference about that very issue in 2011 . . . ."); Jones, *Gillibrand's Bill*, *supra* ("Meanwhile, the top Army prosecutor for sexual assault cases was just suspended after a female lawyer who worked for him accused him of sexually assaulting her at [a] legal conference about sexual assault."); Patricia Murphy, *Top Army Prosecutor Of Sexual Assault Cases Accused Of Groping*, KUOW (Mar. 6, 2014), http://bit.ly/2rcU8Ln; Matthew Guariglia, *Lt. Col. Joseph 'Jay' Morse: 5 Fast Facts You Need to Know*, Heavy (Mar. 6, 2014), http://bit.ly/35XTAaV ("The accusations against [Morse] reflect the deep-seated hypocrisy in the military as well as how ingrained rape culture has become in the American military."); Karen McVeigh, *US army's top sex assault prosecutor suspended over assault claims*, The Guardian (Mar. 6, 2014), http://bit.ly/2Rn3EGJ; Matt Knight, *Army's top sex assault prosecutor suspended after assault allegation*, WTKR (Mar. 6, 2014), http://bit.ly/33MEEv1; Jeremy Bender, *Army's Top Sex Assault Prosecutor Accused Of Groping Woman At Sex Assault Conference*, Business Insider (Mar. 6, 2014), http://bit.ly/382XnWt.

prosecutor assigned to the case informed LTC Morse's defense counsel that the Army

investigators would *not* consider the credibility, reputation, or history of LTC Morse or his

accuser in their investigation, even though Army regulations expressly required them to

"consider[] the source and nature of the information and the totality of the circumstances." *See*

DoDI 5505.07, Glossary pt. II (Jan. 27, 2012) (defining "credible information").

30.     The media noticed irregularities in the Army's investigation, as well. "In April, as

the criminal investigation was unfolding, Morse received a highly unusual written order from an

Army commander instructing him and his attorneys not to speak to any potential witnesses,

effectively hamstringing them in preparing a defense." Whitlock, *Former Army sex-crimes*

*prosecutor reprimanded*, *supra*. "[T]he order was prompted by a complaint from Morse's

accuser, who was upset that the defense team had interviewed potential witnesses—a routine

procedure in such cases." *Id.* LTC Morse formally requested that the illegal order be rescinded,

on the grounds that it was materially unfair, beyond his commanding officer's power, and

infringed on his Constitutional rights. The commander rejected LTC Morse's rescission request.

31.     Understandably, "[t]he Army's handling of the complaint against Morse caused

some consternation in legal circles." Whitlock, *Former Army sex-crimes prosecutor*

*reprimanded*, *supra*. LTC Morse filed a Petition for Extraordinary Writ with the Army Court of

Criminal Appeals to vacate the improper and unconstitutional order. After the Army's

Government Appellate Division chose not to respond to the petition, LTC Morse's commander

rescinded the order. *See id.* ("Morse's lawyers filed objections to the order with the Army's

Court of Criminal Appeals, arguing that it violated his constitutional rights to defend himself.

The Army withdrew the order shortly afterward.").

32.     Through his attorney, LTC Morse submitted sworn statements to investigators categorically denying the allegations that he groped or fondled her, or that he had kissed her without her consent. He also provided a report from a forensic polygraph examiner who had evaluated LTC Morse and concluded that his version of the 2011 incident was truthful. The examiner concluded that the probability LTC Morse was being untruthful was "less than .001."

33.     Through other witnesses' statements, Army investigators and LTC Morse's commander also learned:

- Witnesses who had worked with the accuser expressed "concern . . . regarding [her] honesty" and stated that she "has a poor reputation for truthfulness." In fact, one such witness's statement had not even been solicited by the defense; he felt so strongly about the accuser's character that he had contacted defense counsel on his own initiative after hearing about the accusations;

- The accuser had been married at the time of the incident, contrary to her statements to LTC Morse at the time;

- Although the accuser twice described LTC Morse as her "supervisor" in her statement, LTC Morse was never her supervisor;

- Another conference attendee stated that LTC Morse's accuser told colleagues that she found LTC Morse attractive; she denied any recollection of this;

- The accuser's statements that she tried to avoid contact with LTC Morse after the alleged incident were specifically contradicted by witness statements that the accuser sought out friendly visits with LTC Morse in summer and fall of 2011, as well as by email records in which, six-to-seven months after the alleged incident, the accuser reached out to LTC Morse to solicit mentorship and advice on professional assignments.

34.     Despite the evidence in the case, Army investigators were acutely sensitive to the intense public attention on LTC Morse. In March 2014, the prosecutor on the case mentioned to LTC Morse's defense counsel, without prompting, that he was "keenly aware that no matter what [charging] decision is made, it will be in the media and half the 'people' will be upset."

35.     At some point around April or May of 2014—the investigators' records do not identify when—the Army investigators decided to title LTC Morse for Assault, Abusive Sexual

Contact, and Conduct Unbecoming an Officer and a Gentleman.[4] In May, Army investigators

stated that there was probable cause to conclude LTC Morse had committed those same three

offenses, and so referred the charges to his commander for disposition.

### D.    Disposition of the Charges

36.    "Unlike civilian communities, military commanders exercise discretion in

deciding whether an offense should be charged and how the offenders should be punished."

Dep't of Def., *Military Justice Overview*, http://bit.ly/33KzZJW (last visited Feb. 20, 2020); *see*

*also* Rules for Court-Martial 306(b) (2012). "The disposition decision is one of the most

important and difficult decisions facing a commander." *Military Justice Overview*, *supra*. The

commander may dispose of referred charges in one of four ways:

a.    "The commander may choose to take no action," for example when "[t]he

preliminary inquiry . . . indicate[s] . . . that the only evidence is inadmissible, or . . . other

valid reasons exist not to prosecute." *Id.*

b.    "The commander may initiate administrative action against a soldier. The

commander might determine that the best disposition for this offense and this offender is

to take administrative rather than punitive action. Administrative action is not punitive in

character, rather, it is meant to be corrective and rehabilitative." *Id.* A letter of reprimand

is one such administrative action.

c.    "The commander may dispose of the offense with nonjudicial

punishment," a "means of handling minor offenses requiring immediate corrective

action" that is authorized by the Uniform Code of Military Justice. *Id.* To impose

---

[4] Again, titling is not a determination of guilt or innocence, and involves only a decision to
"plac[e] the name and identifying information of a person, corporation, other legal entity, or
activity in the title block of a criminal investigative report." DoDI 5505.7, at G.2 (Feb. 28, 2018).

nonjudicial punishment, "the commander must be convinced beyond a reasonable doubt that the service member committed the offense." *Id.*

      d.      Finally, for those charges that are serious enough, the commander may forward the charges to a court-martial for trial. *Id.*

37.      LTC Morse's commander, MG Jeffrey Buchanan, disposed of the charge administratively with a letter of reprimand dated May 21, 2014 ("Reprimand") and without initiating any criminal proceeding of any kind. The Reprimand emphasized that LTC Morse had committed an error of judgment that MG Buchanan deemed "disgraceful" and "wholly unbecoming of a senior officer and leader." MG Buchanan also made clear, however, that "*[t]his reprimand is imposed as an administrative measure and not as punishment pursuant to the UCMJ.*" MG Buchanan disposed of the Assault and Sexual Assault charges without any action.

38.      The Reprimand stated that "[i]n accordance with AR 600-37, paragraph 3-6, I am considering filing this reprimand in your Official Military Personnel File, but will make my final decision after consideration of any written matters you wish to submit." In response, LTC Morse submitted 27 documents addressing the allegations against him and 147 letters of support attesting generally to his character and integrity.

39.      On June 1, 2014, LTC Morse submitted a request to retire from active duty, with a requested retirement date of June 1, 2015.

40.      On June 30, 2014, MG Buchanan ordered that the Reprimand be placed only in LTC Morse's local file, meaning that it would not be included in his permanent record. By determining that only a local filing was warranted, MG Buchanan necessarily concluded that LTC Morse had committed no wrongdoing beyond his admitted error in judgment. Had MG Buchanan determined that LTC Morse committed the alleged sexual assault, he would have been

required by law to file the Reprimand in LTC Morse's permanent record. *See* National Defense

Authorization Act for Fiscal Year 2014 ("NDAA"), Pub. L. 113-66, § 1745(a)(1), 127 Stat. 672,

982-83 (2013) ("If a complaint of a sex-related offense is made against a member of the Armed

Forces and the member is convicted by court-martial *or receives non-judicial punishment or*

*punitive administrative action for such sex-related offense*, a notation to that effect shall be

placed in the personnel service record of the member . . . .") (emphasis added); *see also* Army

Reg. 600-37, ¶ 3-4(b)(4) (Dec. 19, 1986) ("[m]inor behavior infractions . . .will not normally be

recorded in a soldier's" permanent file).[5]

### E.    Army Leadership Not Satisfied

41.    On or about July 15, 2014—just two weeks after MG Buchanan locally filed the

Reprimand—another senior officer, Brigadier General ("BG") Paul Wilson, informed LTC

Morse that he was to be relieved of his position as TCAP Chief, and that the "Secretary of the

---

[5] Guidance circulated in late 2014 reinforces the requirements of NDAA § 1745:

> Any . . . punitive administrative action for a sex-related offense . . . will be filed as a sex-related offense in the performance-disciplinary folder of the [permanent record]. For the purpose of this message, *punitive administrative action* means any adverse administrative action initiated as a result of the sex-related offense . . . and *includes, but is not limited to, memorandum or reprimand*, admonishment or censure . . . . Commanders *do not have the authority to designate [that] any of these documents be filed locally* . . . .

Milper Message 14-365, ¶ 4 (Dec. 24, 2014) (emphasis added) (citing Army Directive 2014-29 (Dec. 9, 2014)). This requirement applied retroactively to December 26, 2013, the date that 2014's NDAA became effective. *See* Army Directive 2014-29, ¶ 7. And the Army ordered that commanders review their files and place any such records of disciplinary or administrative action after the effective date in the soldier's permanent record. *See* Milper Message 14-365, ¶ 5 ("Commanders will identify any court-martial conviction, non-judicial punishment, or punitive administrative action for a sex-related offense executed since 26 December 2013 . . . and follow procedures [herein] for processing. This includes any locally filed actions that meet the criteria for a sex-related offense.").

Army wants to see you reduced" in rank upon retirement. Although BG Wilson made it clear that

he believed LTC Morse was innocent of the charged offenses he said that the accusations had

caught the attention of the highest levels of Army leadership, and the potential reduction in rank

came at the direction of the Army Secretary himself.

42.     In response, LTC Morse protested that BG Wilson had read the investigation and

knew that LTC Morse should not have been titled in the first place. And in any event, he pointed

out, BG Wilson knew that a titling decision was an improper basis to relieve someone from a

position. BG Wilson replied, "Jay, how would it look if I didn't?" At that time, there was

significant pressure on Army leadership to give the appearance of vigorous efforts, given

President Obama's looming "deadline for the Pentagon to show 'substantial improvements' in

sexual assault prevention and response, including military justice." *See* Wash. Post Editorial

Board, *supra*.

43.     On July 15, 2014, BG Wilson relieved LTC Morse of his position as TCAP Chief.

On September 16, 2014, BG Wilson issued an OER explaining his decision to relieve LTC

Morse. Despite lauding LTC Morse's leadership, integrity, and achievements as TCAP chief—

calling him "the epitome of professionalism" who "displayed the highest character"—the OER

nevertheless stated that LTC Morse had been relieved from his position "after a [CIDC]

investigation titled him for violating UCMJ Articles 120, 128, and 133 for an alleged incident in

March 2011." Ex. A, at 2. No other reason was given for relieving LTC Morse. The cover

memorandum from BG Wilson compounded the error, informing LTC Morse: "You were

relieved for cause as the Chief of TCAP on 15 July 2014 arising from a [CIDC] investigation

that substantiated that you violated Articles 128, 120, and 133 of the UCMJ for an incident that

occurred on 4 March 2011."

44.     This was incorrect. The Reprimand did not substantiate any charges that LTC

Morse had committed Assault or Sexual Assault; rather, it substantiated the charge that his lapse

in judgment—engaging in consensual kissing with a subordinate—constituted Conduct

Unbecoming an Officer and a Gentleman. The Reprimand did not substantiate any other charges;

indeed, MG Buchanan chose to take no action on the other charges. Had the Reprimand

substantiated the other charges, MG Buchanan would have been required by law to file it in LTC

Morse's permanent record. *See* NDAA, § 1745(a)(1); Army Directive 2014-29, ¶ 4.

45.     On October 6, 2014, LTC Morse requested that his OER be withdrawn under the

applicable laws and regulations. The OER was forwarded to MG Thomas Ayres for

supplemental review.

46.     On January 29, 2015, MG Ayres concluded his "Supplementary Review of [the]

Relief for Cause OER," determining that "the OER is not contrary to law and regulation." MG

Ayres, however, noted that "[i]n general terms, Army Regulation 623-3, Evaluation Reporting

System, 31 March 2014, paragraph 2-12j, requires that when an investigation 'substantiates' an

officer committed an act of sexual harassment or sexual assault, the officer's rater must

document the incident on the officer's OER." Ex. C (Ayres Memo.), at 1. MG Ayres pointed out

that "[o]n 30 Jun 2014, [MG Buchanan] directed that LTC Morse's reprimand be filed in his

local military personnel file," which, MG Ayres concluded, "in effect then substantiated some

misconduct or poor judgment." Ex. C, at 1-2. He then stated his opinion that filing the

Reprimand locally was "wholly appropriate and correlates with the weight of the evidence, the

possibility of a mistake of fact defense by [LTC Morse], and gravity of the accused conduct."

Furthermore, "the relief appears required due to [MG Buchanan's] actions regarding" the March

2011 incident. Ex. C, at 2.

47.     This was incorrect. The Reprimand, and MG Buchanan's decision to locally file it, did *not* substantiate any acts of sexual harassment or sexual assault. And there was certainly no regulation that "required" that LTC Morse be relieved from his post due to the Reprimand for an isolated incident of poor judgment like the one involved here.

48.     Despite the amount of time that had passed, there was still a significant degree of public attention on LTC Morse's case, and there was public outcry at what activists and journalists perceived as a top officer 'getting off easy' by being allowed to retire without punishment. *See* Robert Draper, *The Military's Rough Justice on Sexual Assault*, N.Y. Times (Nov. 26, 2014), https://nyti.ms/2P7tls1; Whitlock, *Reprimanded*, *supra*.

## II.     ADMINISTRATIVE PROCEEDINGS

### A.     CIDC Amendment Request

49.     On September 24, 2014, LTC Morse formally requested that CIDC amend its records and remove his name from the title block of that investigation's record. He asserted that, at the time of the titling decision, there was no credible evidence indicating he had committed sexual assault. He pointed out that the investigators' refusal to consider witness credibility as required by regulation was particularly egregious in this case because the entire case depended on the witness's credibility. As he explained to CIDC:

> In many cases of alleged criminal conduct, there exists independently verifiable, physical evidence to assist an investigator in making her titling decision. However, in cases such as this one, where there is simply no evidence to support the accuser's claim, the credibility of all parties is dispositive. Here, all evidence adverse to LTC Morse is from one source—the accuser. Not only is her credibility or character for truthfulness relevant to the titling decision, it is singularly fundamental.

50.     In connection with the request for amendment, LTC Morse submitted sworn statements from material witnesses who either were never contacted by Army investigators or

had been asked only limited, pointed questions. This evidence further contradicted the accuser's version of the incident. LTC Morse also submitted the letters that had been sent to MG Buchanan in support of locally filing the Reprimand; these letters, without exception, extolled his exceptional character, respect, dedication, and leadership abilities.

51.     On May 15, 2015, CIDC denied LTC Morse's request to overturn the titling decision and remove his name from the investigation report's title block. *See* Ex. D (CIDC Denial), at 1. The CIDC Letter enclosed the redacted records of four officers who had reviewed the titling decision.

      a.     Reviewer 1 stated that "*[c]redible information existed at the time the initial report* was dispatched on 24 Feb 14, to index LTC Morse as a subject in this investigation," because "*[b]ased upon the information available at the time of the initial report* there was no reason to doubt the credibility of the victim's statement." Ex. D, at 3 (emphasis added).

      b.     Reviewer 2 similarly stated that "[c]redible information did exist *at the time of the initial [report]*" on February 24, 2014 "to warrant LTC Morse being titled as a subject in this investigation," because "[t]he victim . . . provided specific and detailed information regarding her complaint" and "presented as a clearly credible, reliable source." Ex. D, at 4 (emphasis added). Reviewer 2 specifically stated that LTC Morse "ha[d] not provided any new, relevant information . . . that an error occurred in applying the credible information standard *on the date of the Initial Report*." *Id.* (emphasis added).

      c.     Reviewer 3's conclusions were redacted and withheld in their entirety because Reviewer 3 disagreed with the other reviewers on the probable-cause determination. However, the CIDC Summary Sheet indicates that Reviewer 3 "agreed

that credible information was present at the time [LTC] Morse was indexed as a subject of the investigation." Ex. D, at 20.

       d.      Reviewer 4 concluded that "*credible information existed at the time of the Initial Report* to index LTC Morse as the subject" of the investigation. Ex. D, at 6.

52.     Nothing in the Record of Investigation, however, indicates that LTC Morse was titled and indexed on February 24, 2014—the day after the accuser's initial report to investigators. In fact, LTC Morse was not titled until in or around April or May 2014, so the CIDC's reviewers erred by focusing on whether there was credible evidence sufficient to title LTC Morse on February 24, 2014.

53.     The distinction between the time of the initial report and the time of titling and indexing is critical. Applicable regulations clearly require that titling-decision reviewers assess whether there was credible information to title "at the time" the titling decision is actually made. *See* DoDI 5505.07, ¶ 6(c) (Jan. 27, 2012). That is important here because Army investigators did not actually make the decision to title LTC Morse until a month or more *after* the accuser made her initial report. And in the period between when investigators received the initial report and when the titling decision was made, they collected significant evidence that called the accuser's statement into question. Investigators were obligated by regulation, specifically DoDI 5505.07, to take into account that additional exculpatory evidence when making their titling decision.

54.     The CIDC also reviewed the probable cause determination, again enclosing the four reviewers' statements. Three reviewers found that the probable cause determination was correct. But the fourth reviewer—whose opinion was withheld from LTC Morse under a claim of privilege—concluded that the probable cause decision was not correct. *See* Ex. D, at 5, 10, 18, 20.

**B.      Proceedings before the Board**

55.      Recognizing the importance of accurate military records, both for the Army and its soldiers, Congress granted the Secretary of the Army (and, by delegation, the Board) the authority to "correct any military record" when "necessary to correct an error or remove an injustice," both defined broadly. 10 U.S.C. § 1552(a)(1).

56.      On March 10, 2017, LTC Morse asked the Board to overturn the relief OER, asserting that the grounds for relieving him (the titling decision) were expressly invalid under the applicable Army regulations.

57.      On March 13, 2018, LTC Morse submitted a supplemental request to the Board to appeal CIDC's denial of his amendment request, asserting that no credible information existed at the time he was titled.

58.      On September 13, 2018, the Board denied both of LTC Morse's requests, stating that "[t]he evidence presented does not demonstrate the existence of a probable error or injustice." Ex. B, at 3. Despite receiving extensive evidence and argument, much of which was recited by the Board, the Board dispensed with LTC Morse's case in just six paragraphs, reproduced here in their entirety:

a.      "The evidence of record confirms that the results of a 2014 CID investigation provided a sufficient legal basis for the applicant to be titled for the offenses of assault, conduct unbecoming an officer, and abusive sexual conduct (adult). He was subsequently relieved of his duties by his [commander] and issued a referred OER." Ex. B, at 17.

b.      "A supplemental review of the OER by regulation noted that when an investigation 'substantiated' an officer committed an act of sexual harassment or sexual assault, the officer's rater must document the incident in the officer's OER. Deputy JAG

22

of the Army concluded that the decision to file a reprimand in the applicant's local military personnel file in effect substantiated some misconduct and poor judgment." Ex. B, at 17-18.

c.      "The referred OER was accepted by Headquarters, Department of the Army, and it is included in the applicant's official record. It is presumed to have been prepared by the properly designated rating officials, and to represent the considered opinion and objective judgment of the rating officials at the time of preparation." Ex. B, at 18.

d.      "By regulation, to support deletion or amendment of a report, there must be evidence that establishes clearly and convincingly that this presumption of regularity should not be applied and that action is warranted to correct a material error, inaccuracy, or injustice. Clear and convincing evidence must be of a strong and compelling nature to overturn or remove a contested report from an individual's record." *Id.*

e.      "The Chief, Investigative Operations Division, and others at CID headquarters reviewed the ROI and the applicant's provided documentation and found there was credible information to list him as the subject of the initial report. The investigative reviewers established probable cause existed to believe the applicant committed the offenses in question." *Id.*

f.      "By law and regulation, titling only requires credible information that an offense may have been committed. It further indicates that regardless of the characterization of the offense as founded, unfounded, or insufficient evidence, the only way to administratively remove a titling action from the DCII is to show either mistaken identity or a complete lack of credible evidence to dispute the initial titling determination.

Titling or indexing does not denote any degree of guilt or innocence. If there is credible evidence to investigate, the subject of the investigation should be titled." *Id.*

59.     The "clear and convincing" evidentiary standard the Board applied, *see* ¶ 58(d), *supra*, is inconsistent with, and more demanding than, the evidentiary standard mandated by regulation. Specifically, 32 C.F.R. § 581.3(e)(2) directs that an applicant need only prove error or injustice "by a preponderance of the evidence." As many cases recognize, the difference between "clear and convincing" evidence and a "mere preponderance," *see Nat'l Org. for Women v. Operation Rescue*, 37 F.3d 646, 662 (D.C. Cir. 1994), is "significant," *e.g.*, *Shannon v. United States*, 512 U.S. 573, 582 (1994).

60.     The Board failed to address LTC Morse's objections to the OER and instead relied entirely on an improper application of the presumption of regularity. *See* ¶ 58(c), *supra*; *Jenkins v. Speer*, 258 F. Supp. 3d 115, 129-30 (D.D.C. 2017) ("The presumption of regularity— to the extent it is not rebutted—requires a court to treat the Government's record as accurate; it does not compel a determination that the record establishes what it is offered to prove.").

61.     Furthermore, the Board failed entirely to consider the substantial evidence of *irregularity* that LTC Morse offered. This evidence included the extensive media attention to his case, the highly unusual cease-and-desist order issued against him, commanders' statements that they knew he was innocent of the charges, and commanders' statements that the highest level of Army leadership, including then-Secretary McHugh himself, were interested in the case—all of which took place against the backdrop of extraordinary political pressure to eradicate sexual assault among service members.

62.     The Board failed to address LTC Morse's arguments regarding the applicable regulations, which specifically prohibit adverse administrative action based on a titling decision.

*See* DoDI 5505.07, ¶ 4(a)(4) (Jan. 27, 2012) ("It is DoD policy that . . . [t]he acts of titling and indexing are administrative procedures and *shall not* connote any degree of guilt or innocence." (emphasis added)); *id.* § 4(e) ("Judicial or adverse administrative actions *shall not* be taken against individuals or entities based solely on the fact that they have been titled or indexed due to a criminal investigation." (emphasis added)). Similarly, the Board failed to address LTC Morse's argument that—contrary to regulation, *see* Army Reg. 623-3—the relief OER explicitly relies on the titling decision *as the sole basis* for relieving LTC Morse.

63.     Although required by regulation to adjudicate LTC Morse's application based "on the evidence of record," Army Reg. 15-185, ¶ 2-2(c) (Mar. 31, 2006), the Board nevertheless failed to grapple with the evidence before it and instead relied entirely on the CIDC's prior assessments, *see* ¶ 58(c), *supra*.

64.     The Board's decision contains no independent assessment of whether the titling decision and probable cause determinations were correct. Likewise, in part because the Board did not properly consider the issues before it, it necessarily did not offer adequate explanation, based on the record, for its conclusions.

65.     Applicable law required the CIDC (and, later, the Board) to independently assess the "investigative information available *at the time* the initial titling and indexing decision was made" in order to "determine whether the decision was made in accordance with the standard" prescribed by regulation. DoDI 5505.07, § 6(c) (Jan. 27, 2012) (emphasis added). The CIDC and the Board (which relied entirely on the CIDC's factual findings) never considered whether there was credible evidence at the time the titling decision was made—that is, at the *close* of the investigation. Contrary to the standard imposed by regulation, they instead considered whether there was credible evidence at the *outset* of the investigation, several months *before* the

investigators actually made the decision to title LTC Morse and *before* the investigation generated substantial information that was directly relevant to the credibility of the accusations lodged against LTC Morse.

66.     The Board concluded, without any evidentiary basis for doing so, that LTC Morse was titled and indexed on February 24, 2014.

67.     LTC Morse has no other adequate remedy at law for the Board's unlawful and improper Denial Order. There is no further administrative option for review and the Board's decision clearly denominates its action as final.

## CAUSES OF ACTION

### COUNT ONE
### Agency Action Contrary to Law and
### Without Observance of Procedure Required by Law (Adverse OER)
### 5 U.S.C. § 706(2)(A), (C), (D)

68.     LTC Morse repeats and incorporates paragraphs 1 through 67 as if fully stated herein.

69.     **Evidentiary Standard.** Federal law permits the Army Secretary, acting through the Board, to "correct any military record" when "necessary to correct an error or remove an injustice" "under procedures established by the Secretary." 10 U.S.C. § 1552(a)(1), (a)(3)(A). The regulations governing Board proceedings require an applicant to prove an error or injustice only "by a preponderance of the evidence." 32 C.F.R. § 581.3(e)(2). Despite these regulations, the Board required LTC Morse to shoulder a heightened evidentiary burden, demanding that he "establish[ ] *clearly and convincingly* that the presumption of regularity should not be applied and that action was warranted to correct a material error, inaccuracy, or injustice." Ex. B, at 18 (emphasis added); *see also id.* ("Clear and convincing evidence must be of a strong and compelling nature to overturn or remove a contested report from an individual's record.").

70.     **Improper Use of Titling Decision.** The Department of Defense Instruction in effect at the time of LTC Morse's OER states clearly it is "DoD policy" that "acts of titling and indexing are administrative procedures and *shall not* connote any degree of guilt or innocence." DoDI 5505.07, ¶ 4(a)(4) (Jan. 27, 2012) (emphasis added). Furthermore, "[j]udicial or adverse administrative actions *shall not* be taken against individuals or entities based solely on the fact that they have been titled or indexed due to a criminal investigation." *Id.* ¶ 4(e) (emphasis added).

71.     LTC Morse's OER explicitly took adverse administrative action against him based solely on the fact that he had been titled, contrary to the direct command of DoDI 5505.07. The OER states that LTC Morse was "relieved . . . after a [CIDC] investigation titled him for violating UCMJ Articles 120, 128, and 133." Ex. A, at 2. While noting that "LTC Morse was the epitome of professionalism . . . and displayed the highest character," the OER nevertheless stated: "Unfortunately, he was titled in a [CIDC] investigation for alleged violations of Articles 128, 120, and 133 of the UCMJ for an alleged incident that occurred in March of 2011." Ex. A, at 1. In his supplemental review, MG Ayres incorrectly concluded that "the OER is not contrary to law and regulation." Ex. C, at 1. The Board compounded this initial error by deferring to MG Ayres's conclusion to find that this evidence "d[id] not demonstrate the existence of a probable error or injustice," Ex. B, at 3, 17-18, instead of assessing the evidence itself, consistent with the Board's function and legal obligations. Because the negative OER was explicitly and solely based on a single impermissible consideration—the titling determination—the OER was contrary to law. *See* DoDI 5505.07, ¶ 4(a)(4) & 4(e) (Jan. 27, 2012). The Board's refusal to take action to correct that clear and manifest legal error was therefore also contrary to law.

72. **Inclusion of Unproven Derogatory Information.** Army regulations provide that "[a]ny mention of unproven derogatory information in an evaluation report can become an appealable matter if later the derogatory information is unfounded." Army Reg. 623-3, ¶ 3-19 (Mar. 31, 2014). The OER referenced and relied on unproven derogatory information by citing the incorrect titling decision based on unfounded charges. The OER thus fell short of Army regulations and was contrary to law. The Board, moreover, failed to apply its own judgment to the question of whether the full record before it established at a "later" time that the "derogatory information is unfounded." The Board instead improperly deferred to the determinations of prior investigators, imposed an inappropriate evidentiary burden on LTC Morse, and therefore failed to correct the OER. These actions were contrary to law.

73. **Failure to Consider Proper Factors.** The Board failed to consider relevant factors when reviewing whether any error or injustice had occurred in the OER process. Rather than analyze the issues for itself, the Board deferred to CID's factual findings and legal conclusions: "The Chief, Investigative Operations Division, and others at CID headquarters reviewed the ROI and the applicant's provided documentation and found there was credible information to list him as the subject of the initial report. The investigative reviewers established probable cause existed to believe the applicant committed the offenses in question." Ex. B, at 18. By failing to independently consider the issue, the Board failed to carry out the duties imposed upon it by law and regulation. *See* Army Reg. 15-185, ¶ 1-8(a) (Mar. 31, 2006) ("The [Board] members will . . . [r]eview all applications that are properly before them to determine the existence of error or injustice."); *id.* ¶ 2-2(c) ("The [Board] will decide cases on the evidence of record."). Accordingly, the Denial Order was contrary to law.

28

## COUNT TWO
### Arbitrary and Capricious Agency Action (Adverse OER)
### 5 U.S.C. § 706(2)(A)

74.     LTC Morse repeats and incorporates paragraphs 1 through 73 as if fully stated herein.

75.     **Failure to Consider Proper Factors.** The Board failed to consider relevant factors when reviewing whether any error or injustice had occurred in the OER decision. Rather than analyze the issues for itself, the Board deferred instead to CID's factual findings and legal conclusions. *See* ¶ 58(e), *supra*; Ex. B, at 18. By doing so, the Board failed to consider the factors required of it under the applicable statutes and regulations. *See* Army Reg. 15-185, ¶ 1-8(a) (Mar. 31, 2006) ("The [Board] members will . . . [r]eview all applications that are properly before them to determine the existence of error or injustice."); *id.* ¶ 2-2(c) ("The [Board] will decide cases on the evidence of record."). Accordingly, the Denial Order was arbitrary and capricious.

76.     **Failure to Adequately Explain Decision.** The Board's Denial Order did not address LTC Morse's arguments that the OER violated Army regulations by basing adverse administrative action solely on impermissible grounds. Rather than address those objections, the Board instead principally relied on MG Ayres's prior determination that "the decision to file a reprimand in the applicant's local military personnel file in effect substantiated some misconduct and poor judgment." Ex. B, at 17-18. And the Board simply ignored the obvious problems with that logic—the letter of reprimand did not substantiate the sexual assault charges. By failing to offer adequate explanation, the Denial Order was arbitrary and capricious.

**COUNT THREE**
**Agency Action Contrary to Law and Without**
**Observance of Procedure Required by Law (Titling Decision)**
**5 U.S.C. § 706(2)(A), (C), (D)**

77.     LTC Morse repeats and incorporates paragraphs 1 through 76 as if fully stated

herein.

78.     **Relevant Timing.** Defense regulations required that "[w]hen reviewing the

appropriateness of a titling and indexing decision, the reviewing official shall consider the

investigative information available *at the time* the initial titling and indexing decision was made

to determine whether the decision was made in accordance with the standard" prescribed by

regulation. DoDI 5505.07, ¶ 6(c) (Jan. 27, 2012) (emphasis added). DoDI 5505.07 likewise

contemplates that military records will be corrected if "[i]t is *later determined* that a mistake was

made *at the time* of titling and indexing, and no credible information indicating that the subject

committed a crime existed." *Id.* ¶ 4(b)(2) (emphasis added). Credible information is specifically

defined: "Information disclosed or obtained by a criminal investigator that, considering the

source and nature of the information and the totality of the circumstances, is sufficiently

believable to lead a trained criminal investigator to presume that the fact or facts in question are

true." *Id.* Glossary pt. II.

79.     Contrary to the clear command of DoDI 5505.07, which required consideration of

the full body of evidence that existed at the time the titling and indexing decision was made in or

around *April or May* of 2014, CIDC examined instead whether "[c]redible information existed at

the time the initial report was dispatched on 24 Feb 14." Ex. D, at 3. "Based upon the

information available *at the time of the initial report*," as one CIDC reviewer stated, "there was

no reason to doubt the credibility of the victim's statement." *Id.* (emphasis added)). CIDC's

decision to use the date of the initial investigation report as the reference point for whether

"[c]redible information existed" was contrary to law *because the titling decision occurred at a later point in time*. By the time of *that* decision, CID agents had received—through their own investigation and directly from counsel for LTC Morse—significant information contradicting both the accuser's credibility and truthfulness, and her version of the events in question. And contrary to DoDI 5505.07's definition of "credible information," Army investigators had unequivocally informed LTC Morse's defense counsel that they would not "consider character for truthfulness of the parties."

80.     In reviewing CIDC's denial, the Board committed the very same error when it determined that that credible information existed "*at the time the investigation was initiated*." Ex. B, at 14. By so doing, the Board failed to apply the correct standard, which required retroactive review of the evidence "at the time" the titling decision *was actually made* in or around April or May of 2014. Thus, the Denial Order was contrary to law.

81.     **Evidentiary Standard.** Additionally, because the Board imposed a clear-and-convincing-evidence standard on LTC Morse that conflicts with (and is more demanding than) the preponderance standard required by law and regulation, 32 C.F.R. § 581.3(e)(2), the Denial Order was contrary to law.

82.     **Failure to Consider Proper Factors.** The Board failed to consider relevant factors when reviewing whether any error or injustice had occurred in the OER decision. Rather than analyze the issues for itself, the Board deferred instead to CID's factual findings and legal conclusions. *See* ¶ 58(e), *supra*. By doing so, the Board failed to consider the factors required of it under the applicable statutes and regulations. *See* Army Reg. 15-185, ¶ 1-8(a) (Mar. 31, 2006) ("The [Board] members will . . . [r]eview all applications that are properly before them to

determine the existence of error or injustice."); *id.* ¶ 2-2(c) ("The [Board] will decide cases on the evidence of record."). Accordingly, the Denial Order was contrary to law.

## COUNT FOUR
### Arbitrary and Capricious Agency Action (Titling Decision)
### 5 U.S.C. § 706(2)(A)

83.　　LTC Morse repeats and incorporates paragraphs 1 through 82 as if fully stated herein.

84.　　**Not Based in Evidence.** The Denial Order was arbitrary and capricious because there was no evidentiary basis for the Board's finding that LTC Morse was "indexed as a subject in a CID investigation" on February 24, 2014. Ex. B, at 8. CID's Report of Investigation makes no mention of a titling and indexing decision on that date—or any other.[6] This fundamental evidentiary error makes the Denial Order arbitrary and capricious because the regulations require that the Board examine whether there was credible information "at the time" investigators actually titled LTC Morse. *See* DoDI 5505.07, ¶¶ 4(b)(2), 6(c) (Jan. 27, 2012). As the record shows, the titling decision actually occurred in or around April or May of 2014.

85.　　The Denial Order was also arbitrary and capricious because its findings indicate it considered evidence irrelevant to the issue before it. The Board stated that "the decision to file a reprimand in the applicant's local military personnel file in effect substantiated some misconduct and poor judgment." Ex. B, at 17-18. However, the letter of reprimand, dated May 21, 2014, substantiated at most the charge of "conduct unbecoming an officer." It specifically *did not* substantiate any sexual-assault or abusive-sexual-contact charges. Nor could a locally-filed letter of reprimand have substantiated those charges; had the Reprimand done so, the commander

---

[6] The sole reference to February 24, 2014 states that on that date, the CID investigators searched for Lt. Col. Morse's name in several law-enforcement databases and found that Lt. Col. Morse had not been the subject of any previous charges or investigations.

would have been required by law to file the letter in LTC Morse's official personnel record. *See* NDAA, § 1745(a)(1); Army Directive 2014-29, ¶ 4.

86.     **Failure to Consider the Proper Factors.** Furthermore, the Board failed to consider the relevant factors in determining that no error or injustice had occurred. Rather than analyze the issues itself, the Board deferred instead to CID's factual findings and legal conclusions. Accordingly, the Denial Order was the result of an improper analytical framework and so was arbitrary and capricious.

87.     **Failure to Adequately Explain Decision.** The Board's Denial Order did not meaningfully address LTC Morse's arguments that CIDC's decision to title him violated Army regulations by failing to consider the credibility of the accuser and ignoring other exculpatory evidence available at the time the titling decision was made. The Denial Order's terse analysis of LTC Morse's argument simply recites the standards for titling and ignores the application of those standards to the facts at hand.

## COUNT FIVE
### Agency Action Contrary to Law (Probable Cause Determination)
### 5 U.S.C. § 706(2)(A), (C)

88.     LTC Morse repeats and incorporates paragraphs 1 through 87 as if fully stated herein.

89.     **Evidentiary Standard.** Because the Board imposed a clear-and-convincing-evidence standard on LTC Morse that conflicts with (and is more demanding than) the preponderance standard required by law and regulation, the Denial Order was contrary to law.

90.     **Failure to Consider Proper Factors.** The Board failed to consider relevant factors when reviewing whether any error or injustice had occurred in the OER decision. Rather than analyze the issues for itself, the Board deferred instead to CID's factual findings and legal conclusions. Ex. B, at 17-18. By doing so, the Board failed to consider the factors required of it

under the applicable statutes and regulations. *See* Army Reg. 15-185, ¶ 1-8(a) (Mar. 31, 2006)

("The [Board] members will . . . [r]eview all applications that are properly before them to

determine the existence of error or injustice."); *id.* ¶ 2-2(c) ("The [Board] will decide cases on

the evidence of record."). Accordingly, the Denial Order was contrary to law.

**COUNT SIX**
**Arbitrary and Capricious Agency Action (Probable Cause Determination)**
**5 U.S.C. § 706(2)(A)**

91.     LTC Morse repeats and incorporates paragraphs 1 through 90 as if fully stated

herein.

92.     **Failure to Consider Proper Factors.** The Board failed to consider relevant

factors when reviewing whether any error or injustice had occurred by failing to follow DoDI

5505.07's command that in determining whether credible evidence existed, the agency must take

into account the source of each piece of evidence—and the source's credibility—as well as the

"totality of the circumstances." *See* DoDI 5505.07, Glossary pt. II (Jan. 27, 2012) (definition of

"credible evidence"). Furthermore, in blindly relying on a presumption of regularity that

ordinarily applies to military records, the Board failed entirely to consider the substantial record

evidence that the Army proceedings in this case were highly *irregular*. Specifically, LTC Morse

presented the Board with significant evidence of the political pressure placed on the military, at

the time of the accusations against him, to respond more aggressively to sexual assault

allegations; the intense public attention LTC Morse's charges received because of the position he

then held as the highest sex-crimes prosecutor in the Army; and the extraordinary (and improper)

cease-and-desist order that was specifically designed to stop LTC Morse's defense counsel from

investigating the charges and preparing a defense.

93.     In addition to failing to consider proper factors, the Board affirmatively relied on

a single improper consideration: the CID determination it was reviewing. Rather than analyze the

34

issues for itself, the Board deferred instead to CID's incorrect factual findings and legal

conclusions: "The Chief, Investigative Operations Division, and others at CID headquarters

reviewed the ROI and the applicant's provided documentation . . . . The investigative reviewers

established probable cause existed to believe the applicant committed the offenses in question."

Ex. B, at 18. By doing so, the Board failed to consider the factors required of it under the

applicable statutes and regulations. *See* Army Reg. 15-185, ¶ 1-8(a) (Mar. 31, 2006) ("The

ABCMR members will . . . [r]eview all applications that are properly before them to determine

the existence of error or injustice."); id. ¶ 2-2(c) ("The ABCMR will decide cases on the

evidence of record."). Accordingly, the Denial Order was arbitrary and capricious.

94.     **Failure to Adequately Explain Decision.** The Board's Denial Order did not

meaningfully address LTC Morse's arguments challenging CIDC's finding of probable cause to

believe he had committed the alleged acts, and asserting that the probable-cause finding ignored

evidence of the accuser's credibility and other exculpatory evidence. The Denial Order merely

repeated the fact that CIDC "found there was credible information to list him as the subject of

the initial report" and, with no further analysis, concluded that "[t]he investigative reviewers

established probable cause existed to believe the applicant committed the offenses in question."

Ex. B, at 18. The Board offered no explanation for its conclusions, so the Denial Order was

arbitrary and capricious.

## PRAYER FOR RELIEF

WHEREFORE, LTC Morse respectfully asks the Court to order the following relief:

A.      Declare that the Denial Order is not in accordance with law;

B.      Declare that the Denial Order is arbitrary and capricious;

C.      Declare that the Denial Order was made without observance of procedure

required by law;

D.      Declare that the Denial Order is, in relevant part, unsupported by substantial

evidence;

E.      Hold unlawful and set aside the Denial Order;

F.      Remand to the Board for further proceedings;

G.      Award costs and reasonable attorney fees to the extent permitted by law; and

H.      Grant such other relief as this Court may deem just and proper.


Dated: April 21, 2020                          Respectfully submitted,

                                               /s/ Thomas C. Green
                                               Thomas C. Green (D.C. Bar No. 14498)
                                               Kwaku A. Akowuah (D.C. Bar No. 992575)
                                               Tobias S. Loss-Eaton (D.C. Bar No. 1019749)
                                               Christopher S. Ross (D.C. Bar No. 1643856)
                                               SIDLEY AUSTIN LLP
                                               1501 K Street N.W.
                                               Washington, DC 20005
                                               T: (202) 736-8000
                                               F: (202) 736-8711
                                               tcgreen@sidley.com
                                               kakowuah@sidley.com
                                               tlosseaton@sidley.com
                                               christopher.ross@sidley.com
                                               *Counsel for Plaintiff Joseph B. Morse*